**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 24-97-DLB-CJS**

**JASON DEBOIS FOCCO** **PLAINTIFF**

**v.** **MEMORANDUM OPINION AND ORDER**

**STEVEN E. WILLIS, III, et al.,** **DEFENDANTS**

*** *** *** *** *** ***

This matter is before the Court upon Defendants Officer Steven E. Willis, III and Officer John Hoober's Motion for Summary Judgment (Doc. # 27). Plaintiff having filed his Response (Doc. # 35), and Defendants having filed their Reply (Doc. # 38), the matter is ripe for the Court's review. For the following reasons, Defendants' Motion for Summary Judgment (Doc. # 27) is **granted.**

## I. FACTUAL AND PROCEDURAL BACKGROUND

On June 12, 2023, Plaintiff Jason Debois Focco traveled from the Orlando International Airport to the Cincinnati/Northern Kentucky International Airport to visit a longtime friend who lived in Ohio. (Doc. # 32 at 53:5-7; 50:8-17). After a hotel-reservation mishap across the river, Focco checked in to the Radisson Hotel ("the Radisson") in Covington, Kentucky. (*Id*. at 51:1-20). Focco quickly dropped his bags off in his room and then walked to a nearby restaurant for dinner where he had two glasses of wine and ordered food to go. (*Id*. at 55:9-25). On his way back he stopped at a gas station to pick up some Almond Joys and Diet Cokes. (*Id*. at 56:10-15). He returned to the Radisson around 6:30 p.m. just in time for the nightly news. (*Id*. at 57:2-3). Upon returning to the

Raddison, Focco experienced an issue with his keycard and was unable to access his room. (*Id*. at 58:15-17). According to Focco, Radisson employees had notified him that they were experiencing issues with their keycard system when he originally checked in. (*Id*. at 54:1-7). Because Focco was unable to access his room, he left his food, Almond Joys, and Diet Cokes in front of his door and went down to the front desk to remedy the issue. (*Id*. at 58:18-20; 71:14-17).

At this point, the events are contested by the parties. The Court will take care to note the facts that are in dispute. Focco alleges that he walked to the front desk, unaware that he was skipping a line, and asked the hotel manager to assist him with his keycard. (*Id*. at 59:3-12). Focco alleges that the "young lady that was running the front desk told [him] in an assertive voice that [he] needed to wait in line." (*Id*. at 60:14-16). At that point, Focco turned to another staff member and "asked him why [the manager] was being so rude to [him]." (*Id*. at 61:1-5). Focco then began to engage in a "colorful conversation" with the individual, at which point the manager told him that if he "cursed one more time she was going to call the police on [him]." (*Id*. at 61:22-25). Focco claims that he does not recall ever cursing or shouting at the manager, but believes his voice was "louder than normal." (*Id*. at 66:21-25). The manager ultimately called the police on Focco and when she notified him that they were on his way he recalls responding by saying "fantastic." (*Id*. at 65:15-23). Focco then recalls asking another employee for assistance to which that employee told him he needed to calm down and not get upset with the manager. (*Id*. at 68:5-14).

The hotel manager's story, which was captured on Defendant Officer John Hoober's body camera footage, paints a slightly different picture. When Hoober arrived

at the Raddison, he first spoke with Focco, who was accompanied by two unidentified hotel employees. (Doc. # 27-3 at 1:50). Focco immediately presented his version of events and quickly offered that he was a veteran. (*Id*. at 2:00-3:00). After this brief initial contact, Hoober went over to talk to the hotel manager, while Defendant Officer Steven E. Willis, III, who had arrived during Focco and Hoober's initial contact, stayed with Focco. (Doc. # 27-2 at 1:40). Hoober and the hotel manager stepped away from the lobby into an employee-only room, where Hoober asked the manager to recount what had transpired with Focco. (Doc. # 27-3 at 3:40). The manager recounted how Focco was in the lobby "screaming off the top of his lungs," calling her a "fucking joke," and using a slew of various expletives towards her and the Raddison in general. (*Id*. at 3:49-3:55). The manager then stated that at that point, she asked Focco to lower his voice or he would have to leave, to which Focco responded saying that she was "not the boss" of him and that he "[didn't] have to do shit." (*Id*. at 3:58-4:02). Due to the disturbance Focco was causing, the manager then asked him to either return to his room or leave the premises, which Focco responded by again saying that she "can't tell [him] to do shit." (*Id*. at 4:20-4:26). The manager explained that despite her various warnings, Focco continued to shout various expletives and hinder her attempts to serve other customers. (*Id*. at 4:26-4:30).

Despite the disturbance Focco had caused, the manager reiterated to Hoober what she had told Focco—that she did not need him to leave the premises but merely wanted him to calm down and go to his room. (*Id*. at 4:40-4:46). When Hoober asked about the room key issue, the manager stated that she recalled him saying that he never got a room key, but if the officers gave her his room number, she would get him a keycard. (*Id*. at

4:50-4:56). After speaking with the hotel manager, Hoober returned to where Focco and Willis, along with the two other unidentified hotel employees, were standing. (*Id*. at 5:15). Hoober asked Willis how Focco was doing, to which Willis responded "drunk." (*Id*. at 5:15-5:18). Focco informed Hoober and Willis that he was going to get his stuff and go to another hotel because he "did nothing wrong." (*Id*. at 5:18-5:22). Hoober then relayed the manager's message to Focco that they were fine with him staying at the hotel. (*Id*. at 5:23-5:25). However, Focco declined to return to his room, responding that he did not want to stay at the Raddison anymore and that he was going to "grab [his] shit and get the fuck out." (*Id*. at 5:25-5:26). Focco again reiterated that he "did nothing wrong" and offered up the information that he was a professional golfer and was staying at the Raddison through his sponsor. (*Id*. at 5:28-5:36).

Focco, still agitated by the interaction between himself and the hotel manager, stated that he "didn't need the manager to tell him that [he was] wrong because [he] wasn't wrong [and he] was loud because he was disrespected." (*Id*. at 5:41-5:45). Hoober then informed Focco that he was still being loud, to which Focco initially excused his volume, stating that his voice was carrying because they were "in a lobby and [the ceilings] were high." (*Id*. at 5:45-5:49). However, Focco almost immediately changed course, stepping towards Hoober and waving his hands stating, "but dude, don't tell me, don't tell me how I need to act, I know my rights, I'm a veteran of thirteen years." (*Id*. at 5:50-5:54). At that point, Willis, who was standing slightly behind Focco and to his left, moved behind Focco while Hoober told him he was under arrest. (*Id*. at 5:55-5:57). Focco asked why he was being arrested, and Willis replied, "do you know about being drunk in public" which Focco

responded "I'm not drunk in public I'm in my hotel that I stayed at." (Doc. # 27-1 at 5:30-5:36).

Due to the proximity between the officers' body cameras and Focco's person, the view is slightly obstructed, and the next few seconds are not caught well on camera. Nevertheless, the footage does clearly show Willis having difficulty handcuffing Focco's left hand. (Doc. # 27-2 at 5:30-5:40). Both Focco and Willis later confirmed that this difficulty was due to the handcuff getting caught on Focco's Apple Watch. (Doc. # 32 at 75-76; *see also* Doc. # 27-4 at 12:28-12:31). As the handcuff got caught on Focco's Apple Watch, Focco jerked his arm away and rotated towards Willis. (Doc. # 27-2 at 5:40-5:42). Although the moment was brief, Willis's body camera caught an image of Focco's feet turned toward Willis—indicating that he had successfully turned his body around to face Willis. (*Id.*). Focco concedes that he pulled his hand forward and "turned" towards Willis during this interaction. (Doc. # 32 at 76:17-19; *see also* Doc. # 35 at 5 ("Willis' handcuffs caught Focco's watch, and Focco jerked his hand forward.")).

The next few seconds after Focco pulled his arm away are chaotic. As Focco tugged his arm away and turned towards Willis, Willis performed a double leg takedown to get Focco on the ground. (Doc. # 27-3 at 6:07-6:11; *see also* Doc. # 34 at 57:13-14). Willis testified that he performed the takedown because he thought Focco was either going to run or become combative after he pulled his arm away and turned toward him. (*Id*. at 57:5-14). Hoober did not actively contribute in the takedown, but because he had control of Focco's right arm, he fell to the ground with Focco and Willis when Willis executed the double leg takedown. (Doc. # 33 at 55:9-13).

While on the ground, Focco alleges that "one or both Defendants struck [him] in the ribs, face, and neck." (Doc. # 1 ¶ 24). Because Hoober and Willis were struggling with Focco once they got him to the ground, there is a period of roughly fourteen seconds where each of the officers' hands are obscured, and therefore it is unclear whether either officer physically struck Focco. (Doc. # 27-3 at 6:07-6:20). However, once Hoober and Willis had more control over Focco, the footage becomes more stable, and Hoober clearly has control of Focco's right arm while Willis had one hand on Focco's head. (Doc. # 27-3 at 6:20-6:27). Willis then ordered Focco to give him his hand, meanwhile Focco was repeatedly stating "guys I'm good." (*Id*. at 6:20-6:30). Willis testified that he had to order Focco to give him his hand because Focco was trying to pull his arms close to his body. (Doc. # 34 at 62:6-8). After securing Focco's left arm, one of the officers instructed Focco to get on his stomach. (Doc. # 27-3 at 6:36-6:56). Hoober began to handcuff Focco while Willis kept his body on top of Focco's left arm. (*Id*.). At one point, Focco can be seen maneuvering his body in a way that looks as if he was attempting to turn onto his back, to which both officers tell him to stop, and turned him back to his stomach. (*Id*. at 7:38-7:40). Focco alleges that during this time Willis kept his knee pressed into his upper back despite the fact that he was not moving and was handcuffed. (Doc. # 1 ¶ 23).

During the entirety of the takedown and following struggle, Focco can be heard shouting at Willis and Hoober. Specifically, Focco was relentlessly asking why he was being arrested, asking what law he broke, claiming that he did nothing wrong, demanding to see a supervisor, demanding the officers respect his rights, declaring that he was a Navy veteran, and using various expletives. (*Id*. at 7:07-8:10). While Focco continued to shout at the officers, one of the officers informed him that if he was compliant, they would

stand him up, while the other cautioned him to stop resisting. (*Id*. at 8:05-8:07). Focco responded by saying "I'm not resisting, you have me in cuffs asshole." (*Id*. at 8:07-8:10). For another twenty seconds, Focco, Hoober and Willis remained on the ground while Focco incessantly asked why he was being arrested. (*Id*. 8:10-8:30). Eventually, Hoober and Willis informed Focco that they were going to pick him up off the ground and they each proceeded to lift him up under his arms. (*Id*. at 8:30-8:33).

As the officers were walking towards the exit, Focco informed them that they "fucked his hip up" and that he needed an ambulance and that he wanted to speak to their supervisor. (*Id*. 8:36-8:39). The officers ignored Focco's request for an ambulance and continued to walk Focco towards the police cruiser. (*Id*. at 8:54-9:00). During the walk to the cruiser, Focco can be seen on Hoober's body cam footage walking bent over, asking for an ambulance, and repeatedly crying out in pain. (*Id*. at 9:00-9:40). When Focco, Hoober, and Willis made it to the cruiser, Hoober unlocked the cruiser, opened the back door, and pushed Focco into the backseat where he landed face down with the lower half of his body outside the vehicle. (*Id*. at 9:35-9:42). Hoober then instructed Focco to get in the car, which Focco informed the officers that he couldn't get in on his own because his hip was broken. (*Id*. at 9:43-9:45). Focco and the officers get into a brief verbal argument, that resulted in Willis going around to the other side of the vehicle grabbing Focco by his shirt, while Hoober lifted him by his feet, to successfully fit him into the backseat. (*Id*. at 9:43-10:01; *see also* Doc. # 27-4 at 3:40-3:44).

Focco was then transported to the St. Elizabeth Medical Center. (Doc. # 32 at 31:21-24). Upon arriving, Focco was unable to get out of the car on his own due to his hip injury. (Doc. # 27-3 at 37:35-38:00). When Hoober continued to ask Focco to get out

of the car, Focco became agitated, asking Hoober if he was "fucking retarded" and telling Hoober that he was being a "prick" and was "out of line." (*Id*. at 37:45-38:30). After being offered a wheelchair, Focco decided that he wanted to attempt to get out of the vehicle himself. (*Id*. at 38:28-38:38). However, Focco was unable to successfully exit the vehicle on his own. (*Id.*). Focco, Hoober, and Willis proceeded to wait for a hospital staff member to arrive with a wheelchair, at which point Willis pulled Focco from the vehicle and sat him in the wheelchair. (Doc. # 27-5 at 4:20-4:33). Once inside the hospital, while hospital staff gathered preliminary information about Focco's injury, Focco, for the next ten minutes, expressed his displeasure with Hoober and Willis and requested at numerous points for his handcuffs to be taken off. (*Id*. at 6:15-15:52).

Hospital staff determined that Focco needed to be taken for an X-ray, so the officers uncuffed Focco's hands from behind his back and re-cuffed him to the hospital bed he was lying in. (*Id*. at 18:30-19:22). As hospital staff transported Focco down the hall to the X-ray room, Focco continued to express his displeasure with the officers, repeatedly telling them that they were "fucked" and that he would "see [them] in court" and specifically telling Hoober to "shut the fuck up." (*Id*. at 21:00-22:10). Once settled in the X-ray room, a hospital staff member informed Willis that they would have to remove Focco from the bed he was currently handcuffed to in order to place him onto the X-ray table. (Doc. # 27-3 at 57:12). Willis uncuffed Focco's right hand, and while holding it down to the bed, warned Focco not to resist. (*Id*. at 57:38-57:41). Hoober and Willis then moved Focco to the X-ray table without incident. However, as Hoober and Willis went to re-cuff Focco to the X-ray bed, Focco yanked his left hand away from Hoober three separate times. (*Id*. at 58:16-58:18). After Focco pulled his arm for the third time, another

struggle ensued. It is unclear from the video footage what maneuver the officers used to get Focco to stop resisting. However, Willis can be seen from Hoober's body footage lying on top of Focco, while either he or Hoober can be heard saying "we're trying to get an x-ray so we can treat you properly. Would you please stop jerking your arm and resisting." (*Id*. at 58:30-58:35).

Aside from the continued verbal displeasure with Hoober and Willis by Focco, the remainder of Hoober and Willis' interaction with Focco was without incident. Medical staff quickly confirmed that Focco had suffered from a fractured hip. (*Id*. at 1:11:15-1:11:18). At that point, the officers issued a citation for public intoxication in violation of KRS 222.202(1), disorderly conduct in violation of KRS 525.060, and resisting arrest in violation of KRS 520.090 (Doc. # 27-7) and left Focco in the care of hospital staff. (*Id*. at 1:45:10-1:46:10). Focco was ultimately diagnosed with a nondisplaced intertrochanteric fracture of the proximal right femur and underwent surgery to repair the fracture. (Docs. # 35 at 3 and 35-4). After a five-day stay at St. Elizabeth, Focco was discharged from the hospital. (Doc. # 35 at 3). Focco eventually pled guilty to the public intoxication and disorderly conduct charges, and the resisting arrest charge was dropped. (*Id*. at 1).

On June 11, 2024, Focco filed this action against Hoober and Willis, in their individual capacities as Covington police officers, alleging: (1) excessive force in violation of his Fourth and Fourteenth Amendment rights (Count I) and (2) battery (Count II). (Doc. # 1 at 5-7). On December 1, 2025, Defendants filed the instant Motion for Summary Judgment on all of Plaintiff's claims (Doc. # 27). Plaintiff having filed his Response (Doc. # 35), and Defendants having filed their Reply (Doc. # 38), the motion is now ripe for the Court's review.

## II. STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When evaluating a motion for summary judgment, "the evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party." *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013) (citation omitted). At the summary judgment stage, the Court "must not make credibility determinations, weigh the respective value of evidence, or resolve material factual disputes." *Alman v. Reed*, 703 F.3d 887, 895 (6th Cir. 2013).

At the outset, the moving party bears "the burden of showing the absence of a genuine issue as to any material fact[.]" *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the movant has satisfied this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-moving party must identify evidence showing that a genuine factual issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). The trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Instead, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material

fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). Where, as here, the parties submit video footage of an incident, the Court must "view the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007).

## III. ANALYSIS

Focco's Complaint raises two claims: (1) excessive force in violation of the Fourth and Fourteenth Amendment (Count I); and (2) battery (Count II). (Doc. # 1 at 5-7). Defendants argue that all of Plaintiff's claims must be dismissed as a matter of law. (Doc. # 27 at 10, 21). The Court turns first to Focco's excessive force claim.

### A. Count I: Excessive Force Under 42 U.S.C. § 1983

42 U.S.C. § 1983 states that any "person who, under color of any statute . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." Thus, to state a claim under § 1983, a plaintiff must show: "(1) that he or she was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of law." *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014).

"An excessive-force claim may arise under the Fourth, Eighth, or Fourteenth Amendments depending on 'whether the plaintiff was a free citizen, convicted prisoner, or fit in some gray area in between the two.'" *Kulpa v. Cantea*, 708 F. App'x. 846, 851 (6th Cir. 2017) (quoting *Burgess*, 735 F.3d at 472). In this case, Focco asserts excessive force in five different incidents: (1) the initial takedown; (2) the alleged punches and knee placement while on the ground; (3) the force used to get him into the cruiser; (4) transporting him personally rather than calling Emergency Medical Services ("EMS"); (5)

the force used to get him out of the cruiser; and (6) obstructing his ability to support his weight inside the hospital. (Doc. # 1 ¶ 50).

Focco argues that he was "pretrial at the point that he was arrested" and therefore, "for purposes of analyzing whether the force used after his arrest [was excessive] . . . the Fourteenth Amendment is applicable[.]" (Doc. # 35 at 17). However, in the Sixth Circuit, "the Fourth Amendment continues to protect individuals post-arrest as long as they are 'seized,' as defined by the continuing seizure rule." *Totman v. Louisville/Jefferson Cnty. Metro Gov't.*, No. 3:07-cv-73, 2009 WL 395435, at *3 (W.D. Ky. Feb. 17, 2009); *see also Phelps v. Coy*, 286 F.3d 295, 300 (6th Cir. 2002) ("We have explicitly held that the Fourth Amendment reasonableness standard governs throughout the seizure of a person."); *id*. (denying an attempt to identify the plaintiff as a pretrial detainee because "the plaintiff was still in the custody of the arresting officers and was never incarcerated."). Accordingly, "[t]he seizure that occurs when a person is arrested continues throughout the time the person remains in custody of the arresting officers." *McDowell v. Rogers*, 863 F.2d 1302, 1306 (6th Cir. 1988); *see also Phelps*, 286 F.3d at 300 ("The 'murky area' does not begin until the protection of the Fourth Amendment ends, and as our precedent establishes that an arrestee in the custody of the arresting officers is still sheltered by the Fourth Amendment."). Therefore, the Court will analyze all of Plaintiff's excessive force claims under the Fourth Amendment standard.

***1. Relevant framework***

"When a free citizen claims that a government actor used excessive force during the process of an arrest, seizure, or investigatory stop, we perform a Fourth Amendment inquiry into what was objectively 'reasonable' under the circumstances." *Coley v. Lucas*

*Cnty., Ohio*, 799 F.3d 530, 537 (6th Cir. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The Sixth Circuit has explained that "[a]n officer making an investigative stop or arrest has 'the right to use some degree of physical coercion or threat thereof to effect it.'" *Miller v. Sanilac Cnty.*, 606 F.3d 240, 251 (6th Cir. 2010) (quoting *Graham*, 490 U.S. at 395-96). However, when an officer uses physical coercion, his actions must be reasonable. *See Cnty. of Los Angeles v. Mendez*, 581 U.S. 420, 427 (2017) ("[R]easonableness is always the touchstone of Fourth Amendment analysis." (quoting *Birchfield v. North Dakota*, 579 U.S. 438, 477 (2016))). "The use of excessive force during an arrest is unreasonable and violates the Fourth Amendment." *LaPlante v. City of Battle Creek*, 30 F.4th 572, 579 (6th Cir. 2022).

Courts analyze Fourth Amendment excessive force claims under an objective reasonableness standard. *Graham*, 490 U.S. at 395. Determining whether an officer used excessive force to effectuate a particular seizure requires the Court to balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against countervailing governmental interests. *Id*. at 396 (citations omitted). "Because the test of reasonableness is not capable of precise definition or mechanical application, . . . its proper application requires careful attention to the facts and circumstances of each particular case, including (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officer or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). While these factors do not prescribe an exhaustive list of relevant considerations, they guide the Court's analysis. *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020). "The calculus of reasonableness must embody allowance

for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. *Graham*, 490 U.S. at 396-97. As the moving party, Defendants are entitled to summary judgment if, after balancing these factors and viewing the record in the light most favorable to Focco, a reasonable jury could not conclude that Defendants used excessive force.

Defendants also argue that they are entitled to qualified immunity from Focco's § 1983 claims. (Doc. # 27 at 19). The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Accordingly, this defense shields a defendant from liability unless, viewing the evidence in the light most favorable to the plaintiff, a reasonable juror could find that: (1) the defendant violated a constitutional right; and (2) that right was clearly established. *Kovacic v. Cuyahoga Cnty. Dep't. of Children and Family Servs.*, 724 F.3d 687, 695 (6th Cir. 2013) (quoting *Morrison v. Bd. of Trustees*, 583 F.3d 394, 400 (6th Cir. 2009)). A right is "clearly established" if the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful," but the action's unlawfulness must have been apparent in light of pre-existing law. *Id.* (citations omitted). So, a plaintiff need not "point to a case 'on all fours with the instant fact pattern to form the basis of a clearly established right,'" but he must

identify "a sufficiently analogous case (or cases) from which a 'reasonable official would understand that what he is doing violates that right.'" *Rhodes v. Michigan*, 10 F.4th 665, 679 (6th Cir. 2021) (first quoting *Vanderhoef v. Dixon*, 938 F.3d 271, 278 (6th Cir. 2019); then quoting *Anderson*, 483 U.S. at 640). "As a matter of public policy, qualified immunity provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 335 (1986).

Focco alleges five separate incidents in which one or both Defendants used excessive force against him: (1) the initial takedown; (2) the alleged punches and knee placement while on the ground; (3) the force used to get him into the cruiser; (4) transporting him personally rather than calling EMS; (5) the force used to get him out of the cruiser; and (6) obstructing his ability to support his weight inside the hospital. (Doc. # 1 ¶ 50). The Court will address each incident in turn. *Wright*, 962 F.3d at 865 (holding that where a plaintiff alleges multiple instances of excessive force, "the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way.").

**2. *Initial takedown***

Focco first alleges that the initial takedown by Defendants in the process of arresting him was a violation of his Fourth Amendment rights. (Doc. # 1 ¶ 50). Specifically, Focco states that the "uncontrolled 'body-slam' maneuver which Defendants were aware posed a high risk of serious injury or death" constitutes excessive force in violation of the Fourth Amendment. (*Id.*). In their Motion, Defendants argue that the "takedown used to arrest Focco was a measured, brief, and constitutionally permissible response to his escalating noncompliance in a crowded hotel lobby." (Doc. # 27 at 11).

Moreover, Defendants argue that Focco "was told he was under arrest, refused clear commands to place his hands behind his back, argued with the officers, jerked his arm free, stepped forward and turned toward them[.]" (*Id.*). Focco, however, argues that he was not resisting arrest, and that he only "reflexively pulled away when Willis' cuffs caught his watch." (Doc. # 35 at 12).

The first *Graham* factor, the severity of the suspected crime, cuts against Defendants. Focco was arrested for public intoxication, disorderly conduct, and resisting arrest. (Doc. # 27-7). He ultimately pled guilty to the public intoxication and disorderly conduct charges, and the resisting arrest charge was dropped. (Doc. # 35 at 1). Generally speaking, a misdemeanor is not "a particularly serious offense." *Thomas v. Plummer*, 489 F. App'x 116, 125 (6th Cir. 2012); *see also Woodcock v. City of Bowling Green*, 679 F. App'x 419, 423 (6th Cir. 2017) (finding the first *Graham* factor to weigh against the officer because the plaintiff "was, at most, guilty of a misdemeanor at the time of the confrontation[.]"). Here, all three of Plaintiff's charges were misdemeanors. Moreover, the two charges to which he pled guilty are not inherently violent or serious crimes. *See id*. (finding the first *Graham* factor in favor of the plaintiff who was guilty of public intoxication, disorderly conduct, terroristic threatening, resisting arrest, and trespassing); *see also Thacker v. Lawrence Cnty.*, 182 F. App'x. 464, 472 (6th Cir. 2006) (concluding that "the crime of disorderly conduct is not a violent or serious crime" despite the plaintiff being "an upset, loud, and swearing individual."). Accordingly, this factor weighs in favor of Focco.[1]

[1] The Court must analyze all of Focco's alleged excessive force claims under this standard. In an attempt to be as concise as possible, the Court will not reiterate this analysis for every alleged use of force. Moving forward, it is presumed that this factor will continue to weigh in favor of Focco.

The second *Graham* factor directs courts to consider "whether the suspect pose[d] an immediate threat to safety of the officers or others." *Graham*, 490 U.S. at 396; *see also Roell v. Hamilton Cnty*., 870 F.3d 471, 481 (6th Cir. 2017). The officers' body cam footage clearly shows Focco intoxicated, loudly cursing, and agitated. (*See generally* Docs. # 27-2 and 27-3). Even so, an individual's "intoxicated state coupled with his [argumentative] demeanor, would not have led a reasonable officer to conclude that [the plaintiff] was a materially greater threat than any non-intoxicated person." *Stanfield v. City of Lima*, 727 F. App'x 841, 846-47 (6th Cir. 2018). The Court acknowledges, however, that Officer Willis did not perform the takedown until Focco pulled his arms away and turned to face the officers. Nevertheless, this action by Focco—which the officers perceived as Focco resisting arrest—is still not enough to conclude that Focco posed a danger to the officers or others. Indeed, the Sixth Circuit has noted that "[i]t cannot reasonably be contended that physically resisting arrest, without evidence of the employment or drawing of a deadly weapon, and without evidence of any intention on the suspect's part to seriously harm the officer could constitute probable cause that the suspect poses an imminent danger of serious physical harm to the officers or others." *Bouggess v. Mattingly*, 482 F.3d 886, 892 (6th Cir. 2007). Accordingly, the second *Graham* factor weighs in Focco's favor.

Finally, the third *Graham* factor asks whether the plaintiff was "actively resisting arrest." *Roell*, 870 F.3d at 482. Active resistance entails "noncompliance" paired with some outward manifestation of "volitional and conscious defiance." *Kent v. Oakland Cnty.*, 810 F.3d 384, 392 (6th Cir. 2017) (quoting *Eldridge v. City of Warren*, 533 F. App'x 529, 534 (6th Cir. 2013)). Active resistance may take the form of "physically struggling

with police, threatening them, resisting handcuffs, or acting erratically." *Moore v. Oakland Cnty.*, 126 F.4th 1163, 1168 (6th Cir. 2025). When an individual actively resists arrest, "officers may use substantial force . . . including takedowns . . . to arrest the person." *Phelps v. City of Saginaw*, No. 1:23-cv-11020, 2025 WL 3157712, at *13 (E.D. Mich. Nov. 12, 2025); *Bozung v. Rawson*, 439 F. App'x 513, 520 (6th Cir. 2011) (finding that a straight-arm bar takedown was not unreasonable because the plaintiff was resisting arrest); *VanPelt v. City of Detroit*, 70 F.4th 338, 341 (6th Cir. 2023) (finding that an officer tackling the plaintiff was not unreasonable because the plaintiff "actively resisted arrest.").

In *King v. City of Rockford*, the Sixth Circuit concluded that a plaintiff who "pull[ed] away from [the officer's] grasp . . . and turn[ed] his body away from [the officer]" rose above "mere noncompliance." 97 F.4th 379, 397 (6th Cir. 2024). The court reasoned that due to the plaintiff's "active resistance, such as the pulling and turning [of his body]" the officer did not violate the Fourth Amendment when he employed a takedown tactic. *Id*. Similarly, in *Burchett v. Kiefer*, the Sixth Circuit determined that no excessive force violation occurred because the plaintiff was "twist[ing] and turn[ing]" and "kind of jumping around." 310 F.3d 937, 940 (6th Cir. 2002).

Here, Focco concedes that he pulled his arm away and turned toward the officers (Doc. # 32 at 76:17-19), however he argues that the jerking of his arm was a reflexive action that did not require a takedown. (Doc. # 35 at 12). Specifically, Focco argues that his actions are more similar to the plaintiffs in *Degolia v. Kenton County*[2] and *Pelton v. Perdue*.[3]

---

2 381 F. Supp. 3d 740 (E.D. Ky. 2019).
3 731 F. App'x 418 (6th Cir. 2018).

However, the Court finds these cases factually distinguishable. In *Degolia*, the plaintiff merely "pulled his left arm back" after two deputies flanked him on either side. 381 F. Supp. 3d at 751. In *Pelton*, the plaintiff "reflexively pulled his arm away" and the court disregarded the attempt to classify that action as a *Graham* resistance factor because it occurred during an "unreasonable investigatory stop" rather than an arrest. 731 F. App'x at 425 ("Sergeant Pifer attempts to shoe-horn these facts into a *Graham* 'resistance' factor, but the cases he quotes speak to resisting arrest, not being physically uncooperative with an unreasonable investigatory stop.").

Here, Focco's resistance occurred during an arrest, and was more than a reflexive jerk. Indeed, Focco not only jerked his arm, but managed to completely extract his arms from the Officers' grip and turn his entire body towards the officers. (Doc. # 27-2 at 5:40-5:42); *see Parsons v. City of Ann Arbor*, No. 22-1338, 2023 WL 3413898, at *3 (6th Cir. May 12, 2023) (concluding that an officer who performed a takedown did not act unconstitutionally because the plaintiff "pulled his hands away from [the officer]" and then "moved like he was trying to escape"); *Est. of Marr v. City of Glasgow*, No. 25-5662, 2026 WL 735026, at *5 (6th Cir. Mar. 16, 2026) (finding that the "undisputed evidence" showed that the plaintiff "actively resisted arrest" when he "prevented [the officers] from cuffing his right hand by pulling it away from their grasp.").

The Court concludes that Focco actively resisted arrest when he pulled his arms away from officers and turned his body towards them while they were in the process of handcuffing him. Accordingly, Officer Willis did not use excessive force when he performed a double leg takedown on Focco, and he is therefore entitled to qualified immunity.

### *3. Striking Focco's person*

Plaintiff next alleges that "striking [his] person while on the ground" constitutes excessive force in violation of the Fourth Amendment. (Doc. # 1 ¶ 50). In their Motion, Defendants state that the body-worn camera footage blatantly contradicts the claim that either Defendant punched or kicked Plaintiff. (Doc. # 27 at 13). Nevertheless, Defendants argue that even taking Plaintiff's allegations as true, the brief punches and knee placement would have been while he was still actively resisting arrest and therefore was objectively reasonable. (*Id.*). Because of the chaos that ensued once Officer Willis conducted his take down, there is a period of fourteen seconds where the body camera footage does not clearly show both officers' hands. (*See generally* Doc. # 27-3 at 6:07-6:20). Therefore, in light most favorable to Focco, the Court will presume one or both of the officers physically struck Focco during those fourteen seconds.

"[O]fficers may not subdue a 'non-violent, non-resisting, or only passively resisting suspect' with physical force such as tasing, pepper-spraying, or beating them." *Moore*, 126 F.4th at 1168 (quoting *Smith v. City of Troy*, 874 F.3d 938, 945 (6th Cir. 2017) (per curiam)); *see also Carter v. Carter*, 728 F. App'x 419, 423 (6th Cir. 2018) ("Our precedents do suggest that officers cannot continue using force against an arrestee who has stopped resisting."). This Court has previously concluded that an officer was not entitled to qualified immunity when he "repeatedly [struck the plaintiff] in the back while [the plaintiff] was in handcuffs and was not actively resisting arrest." *Mata v. City of Grayson*, No. 23-122-DLB-EBA, 2025 WL 3451641, at *8 (E.D. Ky. Dec. 1, 2025).

However, it is clear from the video footage that Focco was not subdued or merely passively resisting. First, the only part of the body camera footage that does not have a

clear view of both officers' hands—and therefore the only possible time the officers could have struck Focco—is the fourteen seconds wherein Officer Willis conducts the double leg takedown and all three fall to the ground. (Doc. # 27-3 at 6:07-6:20). Therefore, because the only possible time the officers could have struck Focco would have been contemporaneous with what this Court has already determined was active resistance, it can be presumed that Focco was not subdued and non-resisting at the time he was struck. Moreover, it took both officers working together a full minute before they could successfully handcuff Focco. (*See id.*). During that time, the officers can repeatedly be heard ordering Focco to give them his hands. (*Id.*). It is also clear from the footage that Focco was certainly flailing or wriggling around, and therefore not complying with the officers' direction. Indeed, at one point, Focco can be seen lying on his side with his hand stretched away from both officers' grip while Officer Willis was attempting to turn Focco onto his stomach, however Focco turned himself onto his back. (Doc. # 27-3 at 6:20-6:27).

Accordingly, because Focco was actively resisting arrest when the alleged strikes could have occurred and continued to be at the very least non-compliant for the duration of the arrest, the officers did not use excessive force when they struck Focco. *See Carter* 728 F. App'x at 423 (concluding that the officers were justified in their force when they "appl[ied] three to four modest punches" because the plaintiff had balled up and "left the officers unable to place him in handcuffs because they did not have access to his hands."); *Id.* ("[T]hat the officers' use of force may not have been the only—let alone the best—method to secure [the plaintiff's] arrest does not make it a constitutionally impermissible method of doing so."); *Roell*, 870 F.3d at 482 (use of force justified when

plaintiff was "kicking, flailing, and wriggling away" from the officer's grasp."); *Marr*, 2026 WL 735026, at *5 ("Thrashing and flailing, as explained above, constitutes active resistance . . . . And although [the plaintiff's resistance might not have been as egregious as some other examples from our caselaw, this court has 'emphasiz[ed] that minimal resistance still constitutes resistance.'" (quoting *King*, 97 F.4th at 397)). Accordingly, because Focco was still actively resisting arrest at the time the alleged strikes to his person occurred, Defendants were justified in their use of force. Defendants are entitled to qualified immunity.

**4. *Placement of Focco into cruiser***

Plaintiff next contends that "throwing [him] headfirst into the back of the cruiser while handcuffed and aware of [his] complaint of a broken hip and then closing the door on his head and face" constitutes excessive force. (Doc. # 1 ¶ 50). In their Motion, Defendants argue Plaintiff was being uncooperative and not assisting in getting into the cruiser and therefore "[u]nder these circumstances, physically guiding, lifting, or pushing an uncooperative arrestee into a patrol vehicle is objectively reasonable." (Doc. # 27 at 14).

In *Thacker*, the Sixth Circuit concluded that officers who pushed an arrestee into the back of a cruiser did not act with excessive force, despite the fact that the arrestee received a deep wound on his arm that required stitches. 182 F. App'x at 472. Specifically, the Court noted that just before he had been pushed into the cruiser, "there had been a heated exchange where [the plaintiff] raised his voice and was swearing at the deputies. A struggle ensued, resulting in [the plaintiff] eventually being handcuffed."

*Id*. Thus, the Court concluded that "considering the totality of the circumstances" the plaintiff could not show excessive force. *Id*.

Compare *Thacker* to the facts of this case. Here, Focco had just resisted arrest which resulted in a takedown by Officer Willis and a full minute of struggle followed by another minute and a half on the ground after he was handcuffed. (Doc. # 27-3 at 6:07-8:30). Both during the struggle and the minutes after Focco continued to raise his voice, swear at, and berate the officers in an almost incessant manner. (*Id*.). Accordingly, considering the totality of the circumstances, "[e]ven if [the officer's] use of force in guiding [Focco] was not entirely necessary, it does not rise to the level of excessive force necessary for a violation of the Fourth Amendment." *Buxton v. Nolte*, 473 F. Supp. 2d 802, 813 (S.D Ohio Feb. 12, 2007); *see also Oklahoma City v. Tuttle*, 471 U.S. 808, 817 n.4 (1985) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a [suspect's] constitutional rights."); *Ferreiras v. City of Covington*, No. 2:24-cv-74-SCM-CJS, 2026 WL 473994, at *6 (E.D. Ky. Feb. 19, 2026) (concluding that an officer pushing a suspect into the back of the cruiser, despite her ankle injury limiting her mobility to get in the car unassisted, did not constitute excessive force because she "posed an immediate threat prior to and during her arrest[.]"); *Carroll v. County of Trumbull*, No. 4:05-cv-1854, 2006 WL 1134206, at *9 (N.D. Ohio Apr. 25, 2006) (finding no excessive force when an officer threw the plaintiff in the cruiser because the plaintiff failed to show that the action "was excessive or resulted in any injury"); *Meloy v. Akron Police Dep't*, No. 5:15-cv-1123, 2017 WL 1387170, at *4 (N.D. Ohio Apr. 18, 2017) ("[A] shove by police for the legitimate purpose of guiding a suspect to a police

cruiser may be permissible force under the particular facts and circumstances of the case."). For these reasons, Defendants are entitled to qualified immunity on this claim

### 5. *Failure to call Emergency Medical Services*

Plaintiff additionally alleges that "transporting [him] to the hospital in a cruiser rather than via ambulance despite being aware that the position caused significant pain and [his] request for an ambulance" constitutes excessive force. (Doc. # 1 ¶ 50). To succeed on this claim, Focco "must show that the officers acted with deliberate indifference to his serious medical need." *Torgerson v. Henderson Cnty.*, No. 6:19-cv-514, 2021 WL 2697138, at *10 (E.D. Tex. May 18, 2021).

Defendants argue that Focco fails to allege a viable deliberate indifference claim. (Doc. # 27 at 17). Focco states that his Complaint contains a "litany of allegations . . . to cite to Defendants awareness of the injuries" and that he "alleged Deliberate Indifference . . . and cited to the Fourteenth Amendment." (Doc. # 35 at 24). This is insufficient in the Court's view. While Focco does state that he "brings this action, raising various claims of Excessive Force and Fourth Amendment Violations, and Deliberate Indifference under 42 U.S.C. § 1983[,]" the relevant count—Count I Violation of Fourth and Fourteenth Amendments—never alleges or even hints at a deliberate indifference claim. (Doc. # 1 ¶ 45, 50). In fact, Focco explicitly states that by "transporting [him] to the hospital in a cruiser rather than via ambulance . . . . Defendants' conduct . . . *constituted excessive force*." (*Id*. ¶ 50-51) (emphasis added). Deliberate indifference is an entirely separate legal standard from excessive force, and the Court will not presume that is what Focco meant when he *explicitly claimed* that the failure to call EMS constituted excessive force. *See Morgan v. Rollins*, No. 6:20-cv-205-REW-HAI, 2023 WL 2438950, at *4 (E.D. Ky.

Jan. 31, 2023) (noting that the plaintiff claimed excessive force but never went "as far as to make a specific claim, against the named defendant for relief regarding [deliberate indifference.]"); *Id.* (while the plaintiff "does discuss both in the Complaint and in his deposition that he did not receive immediate medical intervention . . . . he does not go as far as to make a specific claim, against the named defendants, for relief regarding this failure."); *Tucker v. Brooks*, No. 19-12514, 2022 WL 2813037, at *2 (E.D. Mich. July 18, 2022) ("The Court cannot consider claims not asserted in the operative complaint."). "The end result here is that the Court does not consider deliberate indifference to be contained in the Complaint." *Morgan*, 2023 WL 2438950, at *4. Accordingly, because the Court does not consider deliberate indifference to be alleged in the Complaint, and this claim may only go forward through a deliberate indifference theory, Defendants are entitled to summary judgment.

**6. *Getting Focco out of the cruiser***

Plaintiff next argues that "forcibly moving [his] leg when they arrived at the hospital and causing further injury and pain" constitutes excessive force. (Doc. # 1 ¶ 50). In their Motion, Defendants dispute that Officer Willis roughly and forcibly grabbed Plaintiff's leg when getting him out of the cruiser. (Doc. # 27 at 16). Even so, Defendants argue, Officer Willis was doing "exactly what the situation demanded" and Plaintiff "does [not] identify any alternative method by which the officers could have moved him into the hospital for the medical treatment required." (*Id.*). In his Response, Focco states that the body camera footage contains a "clearly audible crack" and that it was "needless for Willis to manhandle an already injured detainee, instead of getting a trained medical professional that was likely located a few yards away." (Doc. # 35 at 23). The Court has reviewed the

video footage and finds that there is an audible crack when Willis moves Focco's right leg in an attempt to get Focco out of the cruiser. (Doc. # 27-5 at 4:25-4:27). However, Focco's pain alone is not enough to render Willis's action unconstitutional.

"In determining whether there has been a violation of the Fourth Amendment, we consider not the 'extent of the injury inflicted' but whether an officer subjects a detainee to 'gratuitous violence.'" *Miller*, 606 F.3d at 252 (quoting *Morrison*, 583 F.3d at 407). "The question whether force is excessive turns on the objective reasonableness of the officer's conduct under the circumstances." *Id*. at 253.

The Sixth Circuit's case of *VanPelt* is instructive. There, the plaintiff was tackled to the ground, and after being ordered to stand up, the plaintiff informed officers he could not do so because his hip was broken. 70 F.4th at 339. At that point, the officer "released his grip, and [the plaintiff] fell back to the ground." *Id*. The plaintiff continued to yell about his broken hip, and at some point, the officer flipped him onto his right side to search him. *Id*. The plaintiff sued for excessive force, arguing that the officer "yanked him around in a malicious manner plainly designed to inflict pain onto [his] already injured left hip." *Id*. at 341 (internal citations omitted). In determining whether excessive force was used, the Sixth Circuit reiterated that the "excessive-force analysis 'is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Id*. (quoting *Graham*, 490 U.S. at 397). The Sixth Circuit thus found that the record did "not establish any indication of excessive force after the tackling, only an effort to get [the plaintiff] to his feet and then lowering him to the ground." *Id*. In support of this conclusion, the Sixth Circuit noted that the "record presents no evidence that [the officer] had 'evil

intentions' but even if he did, any such evidence would 'not make a Fourth Amendment violation out of an objectively reasonable use of force.'" *Id*.

Here, Focco repeatedly asked for help in getting out of the car stating that he couldn't "pick his right leg up because [his] hip [was] dislocated." (Doc. # 27-3 at 37:44-38:25). Focco not only asked help generally, but also repeatedly asked Officer Hoober to "pick up [his] right leg and get him out of the car." *Id*.; *see also id.* ("pick my right leg up and stand it out and get me on my feet. If not get me a fucking wheelchair or your supervisor because you're out of line dude."). Once a wheelchair arrived, Focco yet again asked for help, because he was lying on his left side with his feet facing towards the front of the cruiser and needed help picking up his right leg to maneuver it out of the cruiser. (Doc. # 27-5 at 4:20-4:27). Officer Willis first helped Focco sit up, and it was then, when Officer Willis picked up Focco's right leg to move it outside of the cruiser, an audible crack can be heard. (*Id*.).

Looking at the totality of the circumstances, including Focco's specific request for the officers to lift his right leg up and out of the car, in addition to the officers' clear underlying intent—getting Focco into the hospital to get treatment—the Court concludes that despite the fact that Focco's hip may have been impacted by the maneuver, it was not done gratuitously or with "evil intentions." *VanPelt*, 70 F.4th at 421; *see also Thacker*, 182 F. App'x at 472 ("The record reflects that the unfortunate wound suffered by [the plaintiff] was simply the unexpected and unintended consequence of being placed in the car."). Accordingly, Focco has failed to demonstrate that Officer Willis used excessive force in extracting him from the cruiser. Officer Willis is therefore entitled to qualified immunity.

**7. *Obstruction of Focco's hands***

Finally, Focco alleges that "continuously obstructing [his] ability to support his weight to move inside the hospital for the only purpose of causing pain and discomfort to [him] were objectively unreasonable, based on the totality of the circumstances." (Doc. # 1 ¶ 50). In their Motion, Defendants argue that Plaintiff was an "intoxicated arrestee who had just resisted officers; they could not simply uncuff him and allow him to brace or maneuver himself freely." (Doc. # 27 at 17). Furthermore, Defendants argue that "[c]ontrolling a detainee's hands during movement is routine and necessary, particularly where the individual has already attempted to pull away during the arrest." (*Id.*).

"Although a defendant ordinarily bears the burden of proof for an affirmative defense, a plaintiff bears the burden of overcoming qualified immunity." *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)); *see also Kennedy v. Smith*, No. 25-1880, 2026 WL 1069973, at *2 (6th Cir. Apr. 20, 2026) ("It's true that a qualified-immunity defense is unusual in that the defendant doesn't bear the full burden of showing the defense. If the defendant properly raises qualified immunity, the burden shifts to the plaintiff to satisfy the two-prong test[.]"). As this Court stated *supra*, in satisfying his burden, Focco must identify "a sufficiently analogous case (or cases) from which a 'reasonable official would understand that what he is doing violates that right.'" *Rhodes*, 10 F.4th at 679.

In his Complaint, Focco states that officers obstructed his ability to support himself. (Doc. # 1 ¶ 50). In support, Focco states that officers "prevented [him] from being able to use his hands to help move from the cruiser into the wheelchair, from the wheelchair to the gurney, from the gurney to the Xray table, and back to the gurney." (*Id.* ¶ 42).

However, after Defendants asserted a qualified immunity defense, Focco abandoned this claim entirely. Indeed, in his Response to Defendants' Motion, Focco does not mention this incident once. (*See generally* Doc. # 35). In fact, this incident is not only completely absent from any excessive force analysis, but it is not even addressed in the factual history section of Focco's brief either. The Court thus concludes that Focco has failed to carry his burden which constitutes a forfeiture of his opposition to Defendants' assertion of qualified immunity. *See Cockrell v. City of Cincinnati*, 468 F. App'x 491, 494 (6th Cir. 2012) ("If the plaintiff fails to carry this burden as to either element of the analysis, qualified immunity applies[.]"); *Paul v. Whitley Cnty., KY, Det. Ctr.*, No. 24-5142, 2024 WL 4262260, at *2 (6th Cir. 2024) ("As [the plaintiff] failed to adequately address [the defendant's] qualified immunity defense, he cannot meet his burden to show that [the defendant] is not entitled to qualified immunity."). Defendants are entitled to qualified immunity.

**B. Battery**

Finally, Focco alleges state law battery claims as to "Defendants' actions in trying to effectuate the arrest of the Plaintiff[.]" (Doc. # 1 ¶ 55). Specifically, Focco alleges that Defendants "acted in bad-faith, or objectively unreasonably, when they body slammed Plaintiff to the ground, struck Plaintiff while on ground [sic] as he offered no resistance." (*Id*. ¶ 56). Defendants argue that Focco's claim fails as a matter of law, or in the alternative, that they are entitled to qualified official immunity under Kentucky law. (Doc. # 27 at 21-22).

Under Kentucky law, the common law tort of civil battery consists of the "unlawful touching of another." *Vitale v. Henchey*, 24 S.W.3d 651, 657 (Ky. 2000) (citation omitted).

A person is liable for battery if "(a) he acts intending to cause a harmful or offensive contact with the person of the other . . . and (b) a harmful contact with the person of the other directly or indirectly results." *Id.* (quoting Restatement (Second) of Torts § 13 (1965)). The Sixth Circuit has held that the "use of excessive force by a police officer constitutes the intentional tort of battery." *Browning v. Edmondson Cnty.*, 18 F.4th 516, 531 (citing *Ali v. City of Louisville*, No. 3:03-cv-427-R, 2006 WL 2663018, at *8 (W.D. Ky. Sept. 15, 2006)).

However, "[o]fficers receive official immunity—the state analogue of qualified immunity—from tort claims like battery if they performed '(1) discretionary acts or functions . . .; (2) in good faith; and (3) within the scope of [their] authority.'" *Kirilova v. Braun*, No. 21-5649, 2022 WL 247751, at *6 (6th Cir. 2022) (quoting *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001)).

As previously stated, the actions of Officer Willis and Hoober during the takedown and arrest of Focco were not considered excessive force that would violate Plaintiff's rights under the Fourth Amendment. *See supra*, III.A.2. Instead, their use of force was a reasonable method of restraining an arrestee that was actively resisting. Focco provides no evidence, direct or circumstantial, that Officers Willis and Hoober acted in bad faith. Focco has not met his burden to convince the Court that Officers Willis and Hoober are not entitled to qualified immunity on the tort claim. Thus, Officers Willis and Hoober are entitled to summary judgment on Focco's claim of battery.[4]

---

[4] Even if Defendants were not entitled to qualified official immunity, a battery claim under Kentucky law must fail where the officer's conduct was deemed objectively reasonable in the § 1983 context. *Atwell v. Hart, Cnty.*, 122 F. App'x 215, 219 (6th Cir. 2005). The Court has determined that the use of force was objectively reasonable, which defeats Plaintiff's battery claims.

## IV. CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** that:

(1) Defendants' Motion for Summary Judgment (Doc. # 27) is **GRANTED**;

(2) This matter is **DISMISSED** and **STRICKEN** from the Court's docket; and

(3) A **Judgment** in favor of **Defendants** will be entered contemporaneously herewith.

This 1st day of September, 2026.

**Signed By:**
***David L. Bunning*** DB
**Chief United States District Judge**

G:\Judge-DLB\DATA\ORDERS\Cov2024\24-97 MOO MSJ.docx